IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.   CRIMINAL NO. 2:24-mj-00136

THEODORE MILLER

**RESPONSE TO DEFENDANT'S MOTION FOR REVOCATION
OF DETENTION ORDER AND FOR RECONSIDERATION FOR BOND**

The United States of America, by Assistant United States Attorney Holly J. Wilson, opposes Defendant Theodore Miller's Motion for Revocation of Magistrate Judge Tinsley's Detention Order and for Reconsideration for Bond, ECF No. 20.

Defendant Theodore Miller ("Defendant") committed the instant offense while living abroad for two and a half years. During that time, he put down roots in Peru, marrying a Peruvian citizen and starting a Peruvian business. He also began operating and promoting an online real estate investment program, Bear Lute, that still exists in defiance of a cease-and-desist order. Since his arrest, he has engaged in obstructive conduct with other targets of the investigation—the same individuals he proffers would make appropriate third-party custodians. Defendant's words and his actions confirm his belief that the rules do not apply to him. He is not amenable to any level of supervision.

Because the United States has established by clear and convincing evidence that Defendant is a danger to the community and by a preponderance of the evidence that Defendant is a flight risk, the court should uphold the magistrate judge's detention order. Defendant should remain in the custody of the United States Marshal Service pending trial of this matter.

## BACKGROUND

### A. Procedural History

On August 8, 2024, Defendant was charged in a criminal complaint with wire fraud in violation of 18 U.S.C. § 1343. The FBI arrested Defendant the same day—upon Defendant's return from living abroad. Exhibit A to Def.'s Mot. for Reconsideration, Hrg. Tr. at 7:6-7:10, ECF No. 20-1 ("Hrg. Tr."). The United States moved to detain Defendant pursuant to 18 U.S.C. § 3142(f)(2).

The United States Probation Office prepared a Pretrial Services Report ("PTR") and provided the report to the United States, to Defendant, and to United States Magistrate Judge Dwane L. Tinsley. It ultimately recommended that Defendant be detained.  PTR at 6.

Magistrate Judge Dwane L. Tinsley held a preliminary hearing and detention hearing on August 15, 2024. The United States presented one witness, FBI Special Agent Aaron Lee, who testified regarding the facts supporting probable cause and Defendant's risk of flight and danger to the community.

After a two and half-hour long hearing, Magistrate Judge Tinsley ordered Defendant detained pre-trial. Judge Tinsley found, by clear and convincing evidence, that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community and, by a preponderance of the evidence, that no condition or combination of conditions of release would reasonably assure Defendant's appearance as required. Judge Tinsley explained that Defendant "lives with his mother and wife" who "may be targets to this investigation," "frequently travels to foreign countries," "has traveled to approximately 16 differen[t] countries," "feels he can do what he wants, when he wants, and how he wants," and

will not "abide by any conditions of release considering the messages he posted on social media" or "cease and desist his criminal activity." Order of Detention (Aug. 16, 2024), ECF No. 18.

Defendant now appeals Judge Tinsley's decision.

### B. Offense Conduct

In June of 2022, Defendant solicited a direct investment from C.T., a resident of California, for the construction of a dry-storage lot and the renovation of a home on Bigley Avenue in Charleston, West Virginia. Hrg. Tr. at 9:3-9:17. Defendant told C.T. that the investment would be "a great way to make a hell of a return, create passive income . . . , and start your journey to create sustainable wealth" and sent C.T. a promotional investment packet. *Id.* at 9:18-9:25. The packet claimed that Defendant would clear, level, and gravel the lot, and install a fence and a security system. *Id.* at 10:1-10:14. Once the lot was completed, Defendant would pay C.T. his initial investment back, plus a sizable return. C.T. reviewed the packet and had a call with Defendant. *Id.* at 10:15-11:16. During that call, Defendant indicated that he was in control of the limited liability company that owned the property. *Id.* Defendant, however, had no ownership interest in that company. *Id.* at 11:14-11:18.

Defendant and C.T. entered an "Investor Agreement" that provided C.T. would invest $20,000 in the project and that Defendant would repay him, plus 15%, by August of 2023. *Id.* at 11:19-12:8. The "Investor Agreement" also granted C.T. a security interest in the subject properties and stated that C.T.'s investment was personally guaranteed by Defendant. *Id.*

On July 5, 2022, C.T. wired $20,000 to Defendant to invest in the project. *Id.* at 12:9-12:13. Thereafter, Defendant did not use the entirety of C.T.'s investment for the project. *Id.* at 12:14-12:19. Indeed, the dry-storage lot was never constructed, and the property remains a vegetated lot. *Id.* at 13:21-14:4. Defendant also never owned the subject property. *Id.* at

12:20-12:22. He had entered into a lease-to-own agreement for a short period of time, but Defendant defaulted by the Spring of 2023. *Id.* at 12:23-13:5

Defendant sent C.T. lulling communications in November and December of 2022. *Id.* at 13:6-13:13. He told C.T. that the project encountered a delay but would be constructed in sixty days. *Id.* When C.T. followed up later, Defendant ceased all communication with him. *Id.*

C.T. never received his investment back or heard from Defendant after December 2022. *Id.* at 13:6-13:20.

### C. International Ties and Travel

Over the course of the last four years, Defendant has developed extensive international ties. Chiefly, Defendant has been married to a Peruvian citizen, Ms. Fatima Condezo, since December 2021. *Id.* at 20:22-20:25; PTR at 2. *But see* Teddy Miller, Facebook, https://www.facebook.com/people/Teddy-Miller/100011180763991/?_rdr, last visited Sept. 3, 2024 (including a public post from March 31, 2024, with images from wedding and stating "so, the other day I married the love of my life"). In December 2022, Defendant stated that he owns a Peruvian-based company, Bear Equity & Investments SAC, which indicates that he has assets abroad. *Id.* at 37:24-38:5; *see* **Exhibit 4,** Letter to W. Va. Sec. Comm., ¶ 3 ("Bear Equity & Investments S.A.C[.] is a Peruvian based company. S.A.C[.] is the designation given to Peruvian based companies.").

Defendant has also spent the last two and a half years living and traveling abroad. According to records from Customs and Border Patrol, Defendant remained outside of the United States from February 12, 2022, to August 8, 2024. Hrg. Tr. at 29:13-29:22; *see* **Exhibit 2**, U.S. Customs and Border Protection Person Encounter List. During that time, he traveled to ten different countries: Peru, Columbia, France, Spain, Korea, Brazil, Thailand, Malaysia, India,

4

Vietnam. PTR at 2. And, prior, between September 2020 to February 2022, he traveled to Mexico eight times. Hr. Tr. at 29:23-30:1; *see* **Exhibit 2**.

In a TikTok video posted by Defendant on July 24, he appears with Ms. Condezo and states:

> I am a fucking hypocrite. I tell you guys all the time: Don't work on the weekends. Enjoy your fucking weekend. You know what? 90% of the time, especially if you do any work for me, you know that's fucking bullshit, because I will send you messages on the weekend, messages on TikTok, emails. You'll look at Saturday night, midnight, and see a fucking email from me because my mind is always fucking working! But here is the thing, I'm trying to encourage you guys not to give up on your way to fucking success, . . . . And if you don't fucking take a break every now and again, it's fucking easy, or get lost in this shit.
>
> Me personally, I never do that. **When I'm feeling a little fucking exhausted or tired, that's when I take off! I don't give a fuck if it's a Friday, Saturday, Sunday, Tuesday, or fucking Thursday. I don't give a shit! Sometimes, I'll just be like literally in my office sitting at my fucking desk, and I'll say fuck it, let's go. And I'll book a ticket for tomorrow, the next fucking day, to get the fuck out, because I need a fucking break 'cause my mind is about ready to fucking snap.**
>
> And, I mean, case in point, like I said, we're at the beach— randomly! **This wasn't fucking planned.** I just told her: "Listen, we are getting on a fucking plane." . . . Then we're on the bed looking at the fucking ocean.
>
> Could I have gotten a better place right on the fucking ocean? Abso-fucking-lutely. . . . But I did not, because **I am Teddy Fucking Miller, and I do what the fuck I want to do.**

**Exhibit 2-A** (emphasis added).

In another TikTok video posted on July 19, Defendant appears traveling through an airport and says:

> **Welcome to the world of Teddy fucking Miller, when you've got to get on a flight last fucking minute** because you decided to maybe build a resort **in another country.** Enjoying my cheesecake.

> Another day another dollar, because you can't make money if you are a fucking pussy.

**Exhibit 2-B** (emphasis added)**.**

### D. Bear Lute Real Estate Investment Program and Previous Noncompliance

Defendant has a history of noncompliance with governmental authorities, specifically with respect to soliciting real estate investments from the public. Defendant runs a real estate investment program known as Bear Lute, which he promotes on social media and administers through his website, bearlute.com. Hrg. Tr. at 32:15-32:23.

In November of 2022, the West Virginia Securities Commission ("WVSC") issued a cease-and-desist order commanding Defendant to stop operating Bear Lute because Defendant was illegally selling securities as an unregistered broker. Hrg. Tr. at 33:21-34:3. Defendant refused to comply with the order, and posted the following statement on his TikTok:

> If you're involved with Bear Lute, my real estate investment program, or you've had a look at the program and you're wondering why I call the quarterly distributions gifts, this is for a few reasons. **One in particular is so I am not regulated by the SEC.** You might think that's a bad fucking idea—not at all**. Actually, if you know anything about big government, it gets super upset if they can't have a piece of the fucking pie or figure out where everybody's money comes from.** You see, by having to go through SEC regulations, it's very limited on who can actually be a fucking investor and I would be required to report to the government everybody's full name, email addresses, how much they've invested, and all their fucking information. **If someone was trying to park some fucking money that maybe they didn't report all of, they could potentially get hit with tax liability. But because that's not my fucking business and I make sure that's not their fucking business, I structured bearlute.com a different fucking way.** And yes, bearlute.com is 100% legal. It's just the first investment program like this in motherfucking existence. If you want to check it out, visit bearlute.com. You can sign up for as little as $100 fucking dollars. Everyone else like and follow to learn how to run shit, but always remember, you can't make money if you're a fucking pussy!

**Exhibit 2-C** (emphasis added).

He also responded to the WVSC in writing on December 19, 2022. *See* **Exhibit 4**. In his letter, he told the WVSC that he was not subject to its regulations because he was not engaged in selling securities. *Id.*; Hrg. Tr. at 37:16-37:23.

In February of 2024, the United States Securities and Exchange Commission ("SEC") emailed Defendant a subpoena to testify in Fort Worth, Texas on April 2, 2024. Hrg. Tr. at 39:4-11. The email was sent to the email address that Defendant previously indicated was his personal, "direct[]" email address. Hr. Tr. at 39:12-39:14; *see* **Exhibit 4** at 3 ("Please email me directly if you have any additional questions. Theodore.********@*****.com"). Defendant did not respond. Hrg. Tr. at 39:12-39:16. The SEC followed up with Defendant on March 29, 2024. *Id.* at 39:17-39:25. Defendant did not respond. *Id.* On April 2, 2024, Defendant did not appear for testimony, as required. *Id.* at 40:1-40:4.

### E. Post-Arrest Obstructive Conduct with Other Targets

After his arrest, Defendant communicated from South Central Regional Jail with his mother, Deanna Drumm; his wife, Ms. Condezo; and his brother. *See* Hrg Tr. 24:6-28:7. Both Ms. Drumm and Ms. Condezo are targets of the investigation. *Id.* at 20:6-20:12.

During a conversation with Ms. Condezo, Defendant complained about law enforcement's seizure of his phone during his arrest, and the two had the following exchange:

| | |
|---|---|
| CONDEZO: | He get, he got his ass inside of the house, and got your phone and your shoes. |
| DEFENDANT: | You know, **I'm tempted to say that you guys should just report it stolen, on Apple, and at least lock it.** |
| CONDEZO: | Huh uh honey, trust me, I was trying to do that, but I don't know your damn password. It's okay. |

7

| | |
|---|---|
| DEFENDANT: | Okay, we are being recorded right now, so . . . |
| CONDEZO: | I know. I know. |
| DEFENDANT: | **Look in my backpack.** |
| CONDEZO: | Yeah, yeah, yeah, I got it. Yeah, I got it. I know what to do. |
| DEFENDANT: | Okay, and **then after that, make sure that that is, umm, not accessible**. Okay? |
| CONDEZO: | Mmm uh. |
| DEFENDANT: | **By anybody else.** |
| CONDEZO: | Uhh huh. |
| DEFENDANT: | Okay, now you've got the answer you needed, ha ha. |

**Exhibit 1-A** at 13:15-14:30 (emphasis added).

In another conversation with Ms. Condezo, Defendant told her "[W]hat's in my backpack . . . is a copy of a lot of passwords . . . on Firefox . . . Just go there and look at passwords and it will tell you. Probably everything you are looking for." **Exhibit 1-C** at 9:50-10:51. Firefox is an application commonly found on computers and other electronic devices. Hrg. Tr. at 27:17-19.

Later, Defendant and Ms. Condezo had the following conversation:

| | |
|---|---|
| CONDEZO: | I know, I know, but how I gonna get into your email? |
| DEFENDANT: | **From the thing in my bag!** |
| CONDEZO: | Uh huh. |
| DEFENDANT: | You understand that right? It's logged into all those things. That's all you gotta do. **And then you just do it quick and then make it, you know, hard to get to**. That's all I'm gonna say. |
| CONDEZO: | Yeah. Except the backpack is, um, … |
| DEFENDANT: | Huh? |
| CONDEZO: | Um, **it's safe, the backpack. So, I can't have access to that.** |

8

| | | |
|---|---|---|
| DEFENDANT: | You can't? | |
| CONDEZO: | No. **It's safe**. It's, um, um, . . . | |
| DEFENDANT: | **But you can access it at some point and get the information you need, right?** | |
| CONDEZO: | **At some point. At some point, yeah.** | |
| DEFENDANT: | Well, that's kind of a problem for you cause it's got the information you need too. | |
| CONDEZO: | Yeah. | |
| DEFENDANT: | Okay, well, it'll be okay. | |
| CONDEZO: | Yeah. | |

**Exhibit 1-D** at 7:00-8:30 (emphasis added).

In conversations with his mother, Ms. Drumm, Defendant told her to "hit the ATMs and stuff because you don't know if they are going to lock the accounts," "just be smart," and "keep your mouth shut." **Exhibit 1-B** at 5:42-6:05; **Exhibit 1-E** at 12:48-14:00. Defendant also spoke with his brother about hauling off and selling an asset worth a "fuck-ton," and having his brother keep the proceeds in trust so that Defendant would have some "pocket change" later. **Exhibit 1-C** at 6:14-9:46.

## STANDARD OF REVIEW

Upon detention by a magistrate judge, a defendant "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly." 18 U.S.C. § 3145(b). The district court conducts a *de novo* review of a magistrate judge's order. *United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989). In the pretrial detention context, the government bears the burden to show either by clear and convincing evidence that the defendant poses a danger to the community or by a preponderance of the evidence that the defendant poses a risk of non-appearance. 18 U.S.C. § 3142(e)(1); *United States v. Stewart*, 19 F. App'x 46, 47 (4th Cir. 2001). "Notably, a danger to the community also encompasses economic harm to others." *United States v. Estes*, No. 7:23-CR-00042, 2024 WL 1858550, at *2

9

(W.D. Va. Apr. 29, 2024); *United States v. Reynolds*, 956 F.2d 192, (9th Cir. 1993) (noting that danger to the community may "encompass pecuniary or economic harm"); *United States v. Jinwright*, No. 3:09-CR-00067, 2010 WL 2926084, at *2–3 (W.D.N.C. July 23, 2010) (collecting cases regarding economic harm to the community as a consideration with regard to detention); *United States v. Madoff*, 586 F. Supp .2d 240, 252-53 (S.D.N.Y. 2009) ("[T]here is jurisprudence to support the consideration of economic harm in the context of detention to protect the safety of the community.").

## ARGUMENT

**A. Defendant poses a serious risk of flight.**

Defendant has the financial means, the travel experience, the ties, and the propensity to flee the country if released on bond. He has no appropriate third-party custodian, and he is generally averse to supervision. He should be assessed as a serious risk of flight.

It is obvious that Defendant has carved out a life abroad, and more specifically, in Peru. He married his Peruvian wife in December 2021 and left the country in February 2022 to be with her there. *See* **Exhibit 2** (showing that Defendant flew from Atlanta, Georgia, to Lima, Peru in February 2022). The two traveled the world over the next two and a half years while Defendant operated Bear Lute and solicited C.T.'s investment. Defendant likely was also able to park assets in Peru during this time—starting a Peruvian business, that by its name, Bear Equity & Investments SAC, appears to have a financial purpose. As his international ties grew, his local ties waned. He maintained businesses in West Virginia, but he was able to operate them remotely. Hrg. Tr. at 7:11-7:15; *see* **Exhibit 2**. His only familial tie to the area was, and is, his mother. *See* PTR at 2. Perhaps the best evidence that Defendant does not call West Virginia is home is the fact that he did not come back for so long. *See* **Exhibit 4**.

Defendant also has enough money to get him to Peru. He is by no means a millionaire, but he has claimed that his net worth is $423,000 and that he earns $4,000 per month. PTR at 3-4. And from his conversations with his brother and Ms. Drumm, he has no problem liquidating assets for his personal benefit. Indeed, he agreed to have his brother haul an item out of his mother's garage that was worth a "fuck-ton" of money and to hold that money in trust for when Defendant needed it. **Exhibit 1-C** at 6:14-11:00. He also instructed his mother to "start hitting the ATMs." **Exhibit 1-B** at 5:42-6:05.

Defendant prefers to travel on a whim, without notice and without planning—especially when he is stressed. When he is "fucking exhausted or tired," that is when he likes to "take off!" **Exhibit 2-A**. It could be any day of the week; he does not "give a fuck if it's a Friday, Saturday, Sunday, Tuesday, or fucking Thursday." *Id.* He sometimes will impulsively say "fuck it, let's go" and immediately "book a ticket for . . . the next fucking day" because he needs a break, and his mind is about to "snap." *Id.* He admits that getting on an international flight "last minute" is an average day in his life. **Exhibit 2-B**.

Defendant has no appropriate third-party custodian. Both Ms. Drumm and Ms. Condezo are targets of the investigation. For that reason alone, placing Defendant in their care would present an extremely high risk of obstruction. And there is plenty of evidence that obstruction has already occurred. In several post-arrest calls with Ms. Condezo, Defendant told her to hide a backpack that likely contains his computer: "make sure that that is, umm, not accessible . . . by anybody else" and "you just do it quick and then make it, you know, hard to get to." **Exhibit 1-D** at 7:00-8:30. Ms. Condezo indicated that she made the backpack "safe" such that she could access it "at some point." *Id.* Additionally, Defendant told Ms. Condezo to report his phone stolen and "lock it" so that it would be useless to law enforcement. **Exhibit 1-A** at 13:15-14:30. In a conversation with

Ms. Drumm, Defendant told her to "keep [her] mouth shut." **Exhibit 1-E** at 12:48-14:00. These women have been involved in Defendant's businesses, are targets of the investigation, and have a motive—love and self-preservation—to protect Defendant and to assist him in fleeing. The Court should not consider them legitimate options for custodians.

More generally, Defendant, by nature, is not a good candidate for supervision. He lacks respect for the law, rejects any form of governmental oversight, and has a history of non-appearance. After the WVSC ordered him to cease operating Bear Lute, Defendant took to social media and explained that he specifically structured the program to avoid government regulation and to assist individuals in avoiding tax liabilities. **Exhibit 2-C**. He vocalized his disdain for governmental control: "[I]f you know anything about big government, it gets super upset if they can't have a piece of the fucking pie or figure out where everybody's money comes from." *Id.* And instead of providing the WVSC with a substantive response, he simply told them that they had no business regulating him. *See* **Exhibit 4**. Additionally, Defendant ignored a federal subpoena from the SEC and failed to appear for sworn testimony in Fort Worth, Texas. Hrg. Tr. at 39-40.

Simply, Defendant is incorrigible. He said it best: "**I am Teddy Fucking Miller, and I do what the fuck I want to do**." Exhibit 2-A (emphasis added).

Based on the foregoing, the United States has shown by a preponderance of the evidence that Defendant is a serious flight risk.

### B. Defendant is an economic threat to the community.

Defendant's crime here is financial in nature: he took $20,000 from C.T. on the promise of using it to build a dry-storage lot, but then he used those funds for his own benefit.

Bottom line: He cannot be trusted with others' money.

Alarmingly, Defendant currently operates a broader real estate investment program, Bear Lute. He administers the program online through his website, bearlute.com, and promotes it on his social media. As of August 15, 2024, bearlute.com was still available on the internet and investors could still send Defendant money. As discussed, he is actively operating Bear Lute in contravention of a WVSC cease-and-desist order.

If released, Defendant would gain access to the internet. He would then be free to continue soliciting investments for the program and would have unfettered access to investor funds—posing a great economic danger to society. "Courts have noted the pervasive and lucrative nature of the internet heightens the economic danger a criminal defendant may pose to the community." *United States v. Alli*, No. 2:22-CR-00395, 2024 WL 3520450, at *8 (E.D.N.Y. July 24, 2024); *see United States v. Wang*, 670 F. Supp. 3d 57, 70 (S.D.N.Y. 2023) (detaining defendant where the Court found she could wage further financial schemes with her potential access to millions of dollars' worth of cryptocurrency and undisclosed accounts over the Internet); *see also United States v. Valerio*, 9 F. Supp. 3d 283, 292 (E.D.N.Y. 2014) (finding that a defendant could proliferate his criminal activity with "any access to any internet capable devices and/or unmonitored telephone calls (including mobile phones)," presenting "an extreme danger to the community"); *United States v. Voelker*, 489 F.3d 139, 145 (3d Cir. 2007) ("The ubiquitous presence of the internet and the all-encompassing nature of the information it contains are too obvious to require extensive citation or discussion."). The fact that the internet is ubiquitous makes enforcing related release conditions impossible. *Valerio*, 9 F.Supp.3d at 295-96 ("[T]here is no way to ensure the full monitoring of defendant's activities. Computers, mobile phones, tablets, etc.—the type of instrumentalities ... used to commit the crimes—are ubiquitous and easy to procure or hide, and increasingly even the lowest-level devices have internet functionality. Unlike in a jail, which

provides greater layers of security . . . , the Court can conceive of several avenues through which defendant may procure or retain such devices on the premises, which heightens the risk of danger to the community."); *see also United States v. Schenberger*, 498 F.Supp. 2d 738, 745 (D.N.J. 2007) ("Access to the internet is possible through desktop and laptop computers, phones, blackberries, etc. Given defendant's computer expertise and police background, this Court is not persuaded that meaningful assurances can be given that defendant's access to the internet can be stopped. [I]t is difficult to conceive of measures that could confidently assure that defendant would not communicate with others and encourage . . . illicit activities.").

And there is no reason to believe that Defendant will voluntarily come into compliance with the WVSC or will resist the urge to misappropriate investors' funds. He has explained that the program is specifically designed to avoid regulation. He believes that Bear Lute is none of the government's "fucking business" and that he has no qualms about investors using it as a tax shelter.

Thus, clear and convincing evidence shows that Defendant is a danger to the community.

## CONCLUSION

For the foregoing reasons, the Motion for Revocation of Magistrate Judge Tinsley's Detention Order and for Reconsideration for Bond, ECF No. 20, should be denied.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

By:

/s/Holly J. Wilson
HOLLY J. WILSON
Assistant United States Attorney
WV State Bar No. 13060
300 Virginia Street, East, Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
E-mail: holly.wilson@usdoj.gov